**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 CR 240** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **DONALD DONAGHER, JR. and** | ) | |
| **PENN CREDIT CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants Penn Credit Corp. ("Penn Credit") and its Chief Executive Officer, Donald Donagher, Jr., are in the debt-collection business. Starting in 2012, the duly-elected Clerks of Court of four counties in two different states hired Penn Credit to collect traffic fines, filing fees, and other court-related debts on behalf of the respective counties. During the same period of time, Defendants provided the Clerks with thousands of dollars in campaign contributions and various gifts of substantial value. Based on that conduct, the government has charged Defendants with five counts of violating the federal programs anti-bribery statute, 18 U.S.C. § 666(a)(2), as well as one count of conspiring to do so, in violation of 18 U.S.C. § 371.

Defendants move to dismiss the indictment based on four primary arguments. First, they contend that, when an alleged violation of § 666(a)(2) is predicated on the payment of campaign contributions, the government must allege and prove an explicit *quid pro quo* as a necessary element given the Supreme Court's holding in *McCormick v. United States*, 500 U.S. 257 (1991). Second, Defendants assert that the

government must also allege and prove a *quid pro quo* whenever an alleged violation of § 666(a)(2) is premised on an intent-to-influence theory, no matter the form of consideration. Third, Defendants argue that § 666(a)(2) requires the government to allege and prove an "official act" within the meaning of 18 U.S.C. § 201(a)(3) whenever an alleged violation is premised on an intent-to-reward theory under *United States v. Sun-Diamond Growers of Ca.*, 526 U.S. 398 (1999). And fourth, Defendants submit that, in light of the constitutional concerns raised by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), § 666(a)(2) is both overbroad and void for vagueness. In the alternative, Defendants move to strike certain portions of the indictment as surplusage, demand a bill of particulars, and request that the Court order the government to provide its *Santiago* proffer and Federal Rule of Evidence 404(b) notice sooner than the rules would require.

For the reasons below, the Court concludes that a *quid pro quo* is a necessary element of a violation of § 666(a)(2) whenever it is based upon the payment of a campaign contribution, but not other forms of consideration. The Court also finds that the present indictment does not sufficiently allege an explicit *quid pro quo*. On the other hand, the Court holds that an "official act" is not a necessary element of § 666(a)(2). Additionally, § 666(a)(2) is not constitutionally infirm, and the counts in the indictment are not duplicitous or otherwise deficient. Accordingly, Defendants' motion to dismiss is granted in part and denied in part, and their remaining motions are denied.

2

# I.     **Background**[1]

A County Clerk of Court, as relevant here, is an elected public official who is responsible for, among other things, maintaining public records and collecting debts, such as traffic fines and court fees, for the county in which he or she is elected. Indictment Count I ¶ 1(h), ECF No. 1. County Clerks of Court sometimes subcontract these debt-collection responsibilities to third-party vendors, and often have the discretion to select the vendors and negotiate the terms. *Id.*

Between 2009 and 2016, the Clerks of Court of four counties ("the Clerks")— Cook County in Illinois and Brevard, Orange, and St. Johns Counties in Florida— paid Penn Credit to collect debts on their behalf. *Id.* ¶ 1(a), (f)–(g). At the same time, Defendants provided the Clerks with thousands of dollars' worth of campaign contributions and other gifts, including sponsorship of meetings and events, payments for meals and entertainment, consulting contracts with individuals and entities associated with the Clerks, donations to affiliated charities, and free robocall services for their campaigns. *Id.* ¶¶ 3, 5. Defendants did so, the government says, "for the purpose of seeking favorable treatment . . . in the award, allocation, and retention of debt collection work." *Id.* ¶ 3. Specifically, according to the indictment, Defendants sought to influence and reward the Clerks in connection with (1) awarding debt collection contracts to Penn Credit, (2) increasing the share of such work allocated to Penn Credit, (3) increasing fees paid to Penn Credit, (4) refusing to

---

[1]     The following facts derive from the indictment and must be taken as true in evaluating Defendants' motion to dismiss. *See United States v. Moore,* 563 F.3d 583, 586 (7th Cir. 2009).

institute a public bidding process for contracts to Penn Credit's detriment, and (5) unilaterally extending the termination date for expiring contracts. *Id*. ¶ 4.

In one example, Donagher allegedly assisted the Cook County Clerk's election campaign by directing Penn Credit employees to place hundreds of thousands of robocalls to voters in support of her candidacy. *Id*. ¶ 12(f). After the Clerk won the election, Donagher reminded Penn Credit's political lobbyists that "we made a shitload of calls for [the Clerk]. Have you all received the numbers we requested to make sure everything is equal?" *Id*. ¶ 12(g).

The following year, the Cook County Clerk advised Donagher that a competing debt-collection firm had donated a substantial sum to her campaign. *Id*. ¶ 12(j). A few hours later, Donagher instructed his staff to "give as much plus a dollar" as the competing firm. *Id*. ¶ 12(i). Over the next few months, he caused a total of $5,000 to be contributed to the Clerk's campaign and allocated an additional $2,500 to host a birthday party in her honor. *Id*. ¶ 1(k)–(m).

In yet another example, Donagher complained to his employees that the Orange County Clerk "busted my stones and said [another debt-collection company] ponied up another 10K." *Id*. ¶ 12(ff). Not long after, Donagher ordered a Penn Credit lobbyist to transfer $5,000 to that Clerk's campaign fund. *Id*. The indictment describes dozens of similar interactions and transactions. *See id*. ¶ 12(a)–(gg).

The government charged Defendants with six separate counts on March 14, 2019. Counts II, III, and VI allege that Defendants violated 18 U.S.C. § 666(a)(2) by making certain campaign contributions to the Cook County Clerk. Counts IV and V

charge them with violating the statute by paying other companies for the purpose of benefiting the Cook County Clerk. And Count I charges Defendants with violating 18 U.S.C. § 371 by conspiring to violate § 666(a)(2) through numerous overt acts.

Defendants move to dismiss the indictment. *See* Defs.' Joint Consolidated Pretrial Mots. ("Mots.") ¶¶ A–D, ECF No. 31; Defs.' Corrected Mem. Supp. Mots. ("Mem.") at 8–61, ECF No. 35. In the alternative, they move to strike surplusage from the indictment, request a bill of particulars, and seek early disclosure of the government's *Santiago* proffer and notice of evidence it intends to present under Rule 404(b). *See* Mots. ¶¶ E–H; Mem. at 61–69. Each motion will be addressed in turn.

## II.    **Motion to Dismiss**

Under Federal Rule of Criminal Procedure 7(c)(1), "[t]he indictment or information must be a plain, concise, and definite statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment satisfies that requirement if it: "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010).

"Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense" charged. *United States v. Hinkle*, 637 F.3d 1154, 1157 (7th Cir. 1981) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)). On the other hand, "when one element of the offense is implicit in the statute, rather

5

than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (cleaned up). In other words, elements implicit in a statute must be explicitly alleged.

"Indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000) (cleaned up). And, "while there must be enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *White*, 610 F.3d at 959. For the purpose of analyzing a motion to dismiss, the allegations in the indictment must be taken as true and viewed in a light most favorable to the government. *Moore*, 563 F.3d at 586.

Here, Defendants challenge the indictment from a variety of angles. Above all, they argue that the indictment is insufficient because it fails to allege the *quid pro quo* or "official act" elements they contend are required of a violation of § 666(a)(2), especially in light of the Supreme Court's decisions in *McCormick* and *Sun-Diamond*. Conversely, if § 666(a)(2) does not require the government to allege an "official act" within the meaning of 18 U.S.C. § 201(a)(3), Defendants contend that the Supreme Court's decision in *McDonnell* renders the statute facially unconstitutional under the First, Fifth, and Tenth Amendments. Third, Defendants assert that Counts II through VI are duplicitous. And fourth, they submit that Count I improperly alleges multiple conspiracies, rather than limiting itself to a single conspiracy. The Court takes each challenge in turn.

## A.    Whether the Indictment Is Sufficient

The primary question presented by Defendants' motion to dismiss is whether the indictment pleads all the essential elements of a violation of § 666(a)(2).  That provision makes it a crime to

> corruptly give[], offer[], or agree[] to give anything of value to any person, *with intent to influence or reward* an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2) (emphasis added).  Additionally, although not in dispute here, the  organization, government, or agency in question must receive, "in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." *Id.* § 666(b).

While the statutory text does not explicitly call for them, Defendants contend that a violation of § 666(a)(2) requires two additional essential elements that the indictment fails to allege: (1) a *quid pro quo* and (2) an "official act."  The former, Defendants argue, is required wherever a charge under § 666(a)(2) is based on a campaign contribution or an intent to influence, and the latter wherever it is based on an intent to reward.

### 1.    Violations Based Upon Payment of Campaign Contributions (Counts II, III, and VI)

Defendants first argue that Counts II, III, and VI, which charge violations of § 666(a)(2) based on payment of campaign contributions, must allege an explicit *quid*

*pro quo* under the Supreme Court's holding in *McCormick*, yet fail to do so. This argument comprises two steps: (1) whether an explicit *quid pro quo* is a necessary element under these circumstances, and (2) if so, whether the indictment sufficiently alleges one.

### a. Whether an Explicit *Quid Pro Quo* Is an Essential Element

The Court begins with the Supreme Court's decision in *McCormick*. That case concerned a state legislator who solicited and received cash donations from members of an interest group, prior to sponsoring a bill benefiting that group. 500 U.S. at 260–61. Prosecutors charged that conduct as extortion in violation of the Hobbs Act, *id.* at 260, defined as "the obtaining of property from another, without his consent, induced . . . under color of official right," 18 U.S.C. § 1951(b)(2). In his defense, the legislator argued that the "under color of official right" clause requires "proof of a *quid pro quo*," which the jury did not have. *McCormick*, 500 U.S. at 265–66. The district court and Fourth Circuit rejected this argument. *Id.* The Supreme Court, however, agreed with the defendant and reversed. *Id.* at 276.

In doing so, the Court was concerned that the broad approach adopted by the lower courts would criminalize everyday political conduct. "Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator," the Court observed. *Id.* at 272. And, in our political system, "[m]oney is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done." *Id.* Under the lower courts' interpretation of the statute,

the Supreme Court cautioned, "legislators commit [a] federal crime . . . [whenever they] support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries." *Id.* To avoid such a result, the Supreme Court held that the "the receipt of [campaign] contributions is . . . vulnerable under the Act . . . only if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." *Id.* at 273.

The question here is whether *McCormick* requires the government to allege an explicit *quid pro quo* when charging a defendant under § 666(a)(2) for providing campaign contributions with the intent to influence or reward a political official in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more. For the following reasons, the Court answers this question in the affirmative.

First, in reaching its decision, the Supreme Court in *McCormick* placed little reliance upon the text and structure of the Hobbs Act itself. Instead, what animated the Court's analysis was concern about criminalizing everyday interactions between politicians and their constituents. Indeed, courts have recognized that the giving of campaign contributions "implicates core First Amendment rights." *See United States v. Ring*, 706 F.3d 460, 465–66 (D.C. Cir. 2013); *see also McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 204 (2014) (characterizing campaign contributions as an exercise of one's "expressive and associational" rights under the First Amendment); *Buckley v. Valeo*, 424 U.S. 1, 24–25 (1976) (observing that campaign contributions

implicate "the contributor's freedom of political association" under the First Amendment). And, thus, First Amendment concerns are implicated when the government attempts to prosecute an individual for giving political contributions under any statute, not just the Hobbs Act. *Cf. McCutcheon*, 572 U.S. at 192 ("Any [campaign finance] regulation must instead target what we have called '*quid pro quo*' corruption or its appearance." (citing *McCormick*, 500 U.S. at 266)).

Second, although the government is correct that the text of § 666(a)(2) does not expressly require a *quid pro quo*, this is not determinative. In fact, courts routinely have read the explicit *quid pro quo* requirement into other criminal statutes. For example, "courts have applied [the] explicit quid pro quo requirement to prosecutions for honest services fraud and bribery when the thing of value offered in exchange for an official act is a campaign contribution." *United States v. Pawlowski*, 351 F. Supp. 3d 840, 849–50 (E.D. Pa. 2018); *see also United States v. Menendez*, 291 F. Supp. 3d 606, 623 (D.N.J. 2018) (holding similarly that, "to prove that a political contribution was the subject of a bribe" under 18 U.S.C. § 201(b)(2), "the government must prove an explicit *quid pro quo*"). The same logic supports extending *McCormick*'s reasoning to federal programs bribery under § 666(a)(2). *Cf. United States v. Siegelman*, 640 F.3d 1159, 1171–72 (11th Cir. 2011) (assuming without deciding that "a *quid pro quo* instruction is required to convict the defendants under § 666" in light of *McCormick*); *United States v. Allinson*, No. CR-17-390-2, 2018 WL 3618257, at *5 (E.D. Pa. July 30, 2018) ("[T]he parties agree that where the alleged bribe takes the form of a campaign contribution, an explicit *quid pro quo* is required [under § 666(a)(2)].").

Finally, the Seventh Circuit has itself construed *McCormick* as "creat[ing] a rule for interpreting federal statutes" writ large that is not limited to the Hobbs Act. *United States v. Allen*, 10 F.3d 405, 411–12 (7th Cir. 1993). In *Allen*, a defendant was convicted of a RICO violation based on predicate offenses involving Indiana's bribery statute. *Id.* at 410. On appeal, he contended that *McCormick*'s *quid pro quo* requirement be extended to the Indiana bribery statute. *Id.* at 410–11. The court largely accepted that argument, stating:

> Given the minimal difference between extortion under color of official right and bribery, it would seem that courts should exercise the same restraint in interpreting bribery statutes as the *McCormick* Court did in interpreting the Hobbs Act: absent some fairly explicit language otherwise, accepting a campaign contribution does not equal taking a bribe unless the payment is made in exchange for an explicit promise to perform or not perform an official act.

*Id.* at 411.

That said, because it recognized that *McCormick* "created a rule for interpreting *federal* statutes, not a *universal* rule of statutory construction," the court in *Allen* declined to apply that principle to the state law at issue. *Id.* at 411–12 (emphases added). This, of course, makes the above statement *dicta*. Even so, the government makes no attempt to address it, and given the blunt and categorical nature of this pronouncement, this Court is dutybound to consider it as persuasive authority absent Seventh Circuit authority to the contrary.

The government's counterarguments are unconvincing. It mainly contends that *McCormick*'s reasoning is cabined to the specific statutory context in which it arose. This is so, the government says, because *McCormick* interpreted statutory

language—"under color of official right," *see* 18 U.S.C. § 1951(b)(2)—absent from § 666(a)(2). But that assertion overlooks how courts, including the Seventh Circuit, have viewed *McCormick* as articulating "a rule for interpreting federal statutes," not just the Hobbs Act. *See Allen*, 10 F.3d at 411–12. Indeed, the government fails to cite a single campaign-contribution case that declined to extend *McCormick*'s reasoning. The government's view is also undermined by *McCormick*'s lack of emphasis on the text and structure of the Hobbs Act extortion provision, as the Court has explained. And, lastly, the government fails to explain how the textual differences between § 666(a)(2) and § 1951 alleviate *McCormick*'s constitutional concerns about criminalizing ordinary campaign finance activity.

Accordingly, the Court concludes that the government must allege an explicit *quid pro quo*, as an implied element of the offense, where the "thing of value" under § 666(a)(2) consists of a campaign contribution.

### b.    Whether the Indictment Alleges an Explicit *Quid Pro Quo*

The next question is whether the § 666(a)(2) counts based on campaign contributions adequately allege an explicit *quid pro quo*. This element is satisfied when the payment "is made in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Allen*, 10 F.3d at 410; *see also United States v. Blanford*, 33 F.3d 685, 696 (D.C. Cir. 2013) ("[M]erely knowing the payment was made in return for official acts is enough."). An explicit *quid pro quo* must "be clear and unambiguous, leaving no uncertainty about the terms of the bargain." *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992).

It is undisputed that the indictment nowhere mentions a "*quid pro quo*" or uses any "words of similar import," *see United States v. Wabaunsee*, 528 F.2d 1, 3 (7th Cir. 1975) (noting that such words may "supply the required element"), such as "in exchange for," *see United States v. Willis*, 844 F.3d 155, 164 (3d Cir. 2016). Instead, the government contends that the allegations "provide ample basis for *inferring*" that Defendants' campaign contributions were part of an exchange. Gov't Resp. Opp'n Mots. ("Resp.") at 21, ECF No. 45 (emphasis added).

It is true that "[a]n implicit allegation of an element of a crime is enough." *United States v. Khan*, 937 F.3d 1042, 1049–50 (7th Cir. 2019). But it is *not* enough for an indictment to possibly or even plausibly imply an essential element. Rather, the element must be "*necessarily* implied." *United States v. Palumbo Bros.*, 145 F.3d 850, 860 (7th Cir. 1998) (emphasis added); *accord Gov't of Virgin Islands v. Moolenaar*, 133 F.3d 246, 249 (3d Cir. 1998); *United States v. DeSalvo*, 41 F.3d 505, 513 (9th Cir. 1994). This requirement is needed to "ensure that the grand jury found probable cause" that an explicit *quid pro quo* has in fact occurred. *See Vigil*, 2006 WL 8444470, at *8.

A recent (albeit unpublished) Seventh Circuit case illustrates how the "necessarily implied" test operates in practice. *See United States v. Barrios-Ramos*, 732 F. App'x 457 (7th Cir. 2018). There, the court found a conspiracy charge sufficient on the ground that it "necessarily implied conduct that is knowing and intentional," an essential element that the indictment did not explicitly allege. *Id.* at 460. In so holding, the court reasoned that "[i]t is difficult to imagine how someone

13

could involuntarily or accidentally come to an agreement." *Id*. Thus, because "a person cannot 'conspire'—*i.e.*, agree—without intending to do so," the indictment sufficed to allege the requisite intent. *Id*.

Here, by contrast, the indictment does not *necessarily* imply that any of the three campaign contributions at issue—made on or about July 19, 2013, September 23, 2013, and July 28, 2014, respectively—took place in exchange for an explicit promise or undertaking by the Cook County Clerk. Granted, the indictment does allege that Defendants made those payments "for the purpose of *seeking* favorable treatment for [Penn Credit] in the award, allocation, and retention of debt collection work." Indictment Count I ¶ 3 (emphasis added);[2] *see also id*. Count II ¶ 2, Count III ¶ 2, Count VI ¶ 2 (alleging that Defendants made their campaign contributions "intending to influence and reward [the Cook County Clerk] in connection with . . . the referral of traffic debt placements from the Clerk's Office."). And, certainly, a reader of the indictment might reasonably conclude that the campaign contributions were made in exchange for the Clerk's decisions to provide debt collection contracts to Penn Credit; to shift more debt collection work to Penn Credit from its competitors; to extend Penn Credit's contract terms; and/or to not place the debt collection contracts out for bid. But it is not enough that such an inference be reasonable; it must be necessary. And a reader of the indictment could also plausibly infer that

---

[2]  In reviewing the sufficiency of the indictment's allegations, the Court assumes (as do Defendants) that the government meant to incorporate *all* paragraphs of Count I, the conspiracy count, into each of Counts II through VI, the substantive counts, rather than just "Paragraph One of Count One," as the indictment states. *See* Indictment Count II ¶ 1, Count III ¶ 1, Count IV ¶ 1, Count V ¶ 1, Count VI ¶ 1.

Defendants gave their contributions with the mere hope that the Clerk would confer favorable treatment upon Penn Credit in return, without any understanding or agreement as to how their efforts would be received. *See id.* Count I ¶ 12(k), (m), (u) (describing the payments underlying Counts II, III, and VI).

This ambiguity is compounded by the fact that the only benefit Defendants are alleged to have received from the Cook County Clerk is a debt collection contract that Penn Credit began executing in July or August of 2011. *See id.* ¶¶ 1(a), 12(b). Because that precedes the earliest of the campaign contributions at issue by two years, the inference that Defendants made those contributions in exchange for the benefits they sought from the Clerk is not ineluctable.

In reaching this result, the Court is mindful of the need to review indictments "on a practical basis and in their entirety" rather than in a "hypertechnical manner." *Miller*, 883 F.3d at 1002. But ensuring that the grand jury considered the explicit *quid pro quo* element in the context of campaign contributions is anything but a technicality; to the contrary, given the controlling law, doing so is necessary to shield ordinary, constitutionally protected campaign financing activities from criminal prosecution. *See McCormick*, 500 U.S. at 271–73. As such, its absence from the indictment renders insufficient Counts II, III, and VI, which are accordingly dismissed without prejudice. To the extent that Count I rests on those charges, it likewise is dismissed without prejudice.

2. **Violations Based Upon Other Consideration (Counts IV–V)**

   a. **Whether an Intent-to-Influence Theory Requires a *Quid Pro Quo***

Turning to the § 666(a)(2) counts premised upon consideration other than campaign contributions, Defendants contend that they, too, must allege a *quid pro quo* to the extent the government charges an "intent to influence" violation. *See* 18 U.S.C. § 666(a)(2). Defendants do concede that the appellate court "long ago held that a specific *quid pro quo* is not an element of § 666(a)(2)" in the case of ordinary consideration. *See Boender*, 649 F.3d at 654 (citing *United States v. Agostino*, 132 F.3d 1183, 1190 (7th Cir. 1997)). But they insist that this holding is limited to the statute's intent-to-reward prong, whereas the intent-to-influence prong should be interpreted differently under *Sun-Diamond* and *Boender*. *See* 2/17/19 Order at 4–6, *United States v. Tamras-Martin*, No. 18-CR-267-2, ECF No. 63 (N.D. Ill.) (Chang, J.) (adopting Defendants' view). The government takes issue with this bifurcated approach.

While the controlling case law is a bit opaque, the government has the better of this argument. *Agostino* is the key decision. Much as here, the defendant there argued that the indictment, which alleged one count of violating § 666(a)(2), was insufficient for failing to allege a *quid pro quo*. 132 F.3d at 1189–90. The court disagreed, reasoning that the "statutory language . . . requires [only] that the defendant act '*corruptly . . . with intent to influence or reward*'" and "declin[ing] to import an additional, specific *quid pro quo* requirement" into the statutory elements. *Id.* at 1190 (quoting 18 U.S.C. § 666(a)(2)). In so holding, the court neither drew nor

16

suggested a distinction between the intent-to-influence and intent-to-reward prongs. In fact, to the extent the court emphasized either prong, it was the intent-to-influence one. *See id.* ("Agostino first argues that because *quid pro quo* is an 'essential element' of a violation of § 666, the indictment is facially insufficient for failing to identify the specific act or acts he was *trying to influence* by giving Goetz $4,000." (emphasis added)).

True, *Agostino* did suggest a distinction between § 666(a)(2)'s intent prongs in addressing the defendant's sentencing challenge. *See id.* at 1195. There, the court observed that "the payment is a bribe" if the payer intends "to *influence* or affect future actions," and an illegal "gratuity" if the payer "intends the money as a *reward* for actions the payee has already taken, or is already committed to take." *Id.*; *accord United States v. Anderson*, 517 F.3d 953, 961 (7th Cir. 2008). *But see United States v. Fernandez*, 772 F.3d 1, 22–26 (1st Cir. 2013) (holding to the contrary that the intent-to-reward prong "merely clarifies 'that a bribe can be promised before, but paid after, the official's action on the payor's behalf'" (quoting *United States v. Jennings*, 160 F.3d 1006, 1015 n.3 (4th Cir. 1998))). But the court did not relate this distinction to its earlier discussion of whether a *quid pro quo* is an essential element of § 666(a)(2). *See Agostino*, 132 F.3d at 1195–96.

A few years later, the Supreme Court's *Sun-Diamond* decision drew a similar distinction between bribes and gratuities in the context of 18 U.S.C. § 201.[3] *See* 526

---

[3] As the Supreme Court has explained, Congress enacted § 666 to extend § 201's prohibition against bribery of federal officials "to bribes offered to state and local officials employed by agencies receiving federal funds." *Salinas v. United States*, 522 U.S. 52, 58 (1997).

U.S. at 404–05. There, the Court set the stage by noting that § 201 sets forth "two separate crimes," with § 201(b)—whose intent element is "corruptly . . . with intent . . . to influence," 18 U.S.C. § 201(b)(1)(A)—being "bribery," and § 201(c) being "illegal gratuity." *Id.* at 404. The Court then distinguished between these crimes based on their "intent element[s]," remarking that "for bribery there must be a *quid pro quo*— a specific intent to give or receive something of value *in exchange* for an official act," whereas an illegal gratuity "may constitute merely a reward for some future act that the public official will take . . . or for a past act that he has already taken." *Id.* at 404–05; *see also United States v. Peleti*, 576 F.3d 377, 383 (7th Cir. 2009) (recognizing § 201's bribe/gratuity distinction).

While *Sun-Diamond*'s distinction between bribes and gratuities would seem to map onto the intent prongs of § 666, the Seventh Circuit has not actually adopted it in this context. To the contrary, the court's next relevant decision, which pertained to § 666(a)(1)(B), reiterated *Agostino*'s unqualified pronouncement that "the statute does not require" a *quid pro quo*. *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005). "A *quid pro quo* of money for a specific . . . act," the court explained, "is *sufficient* to violate the statute, but it is not *necessary*." *Id.*[4] And, as in *Agostino*, the

---

[4]    In so stating, *Gee* did not discuss the court's seemingly contrary assertion, in *United States v. Medley*, that "[t]he essential element of a section 666[(a)(1)(B)] violation is a 'quid pro quo.'" 913 F.2d 1248, 1260 (7th Cir. 1990); *see Gee*, 432 F.3d at 714–15. *Medley* had been distinguished by *Agostino* on the ground that it "involved a violation of [§] 666(a)(1)(B), which criminalizes the *receipt* of a bribe," whereas § 666(a)(2) "focuses on the *offer* of a bribe," though the court did not explain why parallel language in these parallel provisions warrants dissimilar interpretation. *See* 132 F.3d at 1190; *compare* 18 U.S.C. § 666(a)(1)(B), *to id.* § 666(a)(2). Nonetheless, the court has since reiterated *Gee*'s view. *See United States v. Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) ("In any case, evidence of quid pro quo is not necessary to establish a violation of § 666(a)(1)(B)." (citing *Gee*, 432 F.3d at 714–15)).

court implied that this conclusion pertains to each of the statute's intent prongs. *See id.* at 714–15 ("It is enough if someone 'corruptly solicits or demands . . . anything of value from any person, *intending to be influenced or rewarded* in connection with any business, transaction, or series of transactions' . . . . A sensible jury could conclude that [the defendant] had *this corrupt intent . . . .*" (emphases added) (quoting 18 U.S.C § 666(a)(1)(B) and citing *Agostino*, 132 F.3d at 1190)).

The next in this line of cases goes some way toward Defendants' view, but not far enough. *See Boender*, 649 F.3d 650. Challenging the sufficiency of the evidence, the defendant in *Boender* argued that "a violation of § 666(a)(2) requires evidence of a specific *quid pro quo.*" *Id.* at 654. The court swiftly rejected that argument, noting that *Agostino* "long ago held that a specific *quid pro quo* is not an element of § 666(a)(2)," and that *Gee* had recently articulated the same principal with respect to § 666(a)(1)(B). *Id.*

Most salient here, the court then rejected the argument that *Sun-Diamond*'s distinction between bribes and gratuities overcame "the obstacle of circuit precedent." *Id.* at 654–55. In so doing, the court reasoned that *Sun-Diamond* "undermined" the defendant's own argument because, whereas § 201 criminalizes bribes and gratuities under different sections, § 666(a)(2) does so "in the same section." *Id.* at 655. But, while this reasoning might suggest that bribery under § 666(a)(2)—*i.e.*, the intent-to-influence prong—does require a *quid pro quo*, the court did not in fact so hold. Rather, the court simply posited that, "[i]f the Supreme Court's construction of § 201 in *Sun-Diamond* tells us anything about § 666(a)(2), it is what we said in *Gee:* 'A *quid*

19

*pro quo* of money for a specific legislative act is sufficient to violate the statute, but it is not necessary.'" *See id* (quoting *Gee*, 432 F.3d at 714). The court thus found no reason "to reconsider" the broad holdings of *Agostino* or *Gee*. *Id*. at 654–55.

Equally unavailing is *United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015). Defendants make much of the court's finding no error in a jury instruction equating an intent to influence under § 666(a)(1)(B) with *a quid pro quo*. *See id*. at 882. But the defendant only challenged the intent-to-reward instruction, so the court did not address whether the intent-to-influence instruction was required to mention a *quid pro quo*. *See id*; *cf. Boender*, 649 F.3d at 654 ("[A] jury instruction suggesting such a requirement would be incorrect as matter of law."). What is more, the court cited with approval its relevant pattern jury instruction, *see Hawkins*, 777 F.3d at 882, which does not require a *quid pro quo* for purposes of § 666(a)(2), *see* Pattern Criminal Jury Instructions of the Seventh Circuit at 279 ("A person acts corruptly when that person acts with the intent that something of value is given or offered to reward or influence an agent . . . ."). Further yet, the court neither mentioned § 666(a)(2) nor had an occasion to revisit *Agostino* or *Gee*. *See id*. at 881–82.

Accordingly, the Court is constrained to read the appellate court's controlling cases to hold that neither the intent-to-influence nor the intent-to-reward prong of § 666 requires a *quid pro quo* in the non-campaign-contribution context. Indeed, other courts have adopted a similar reading of these cases. *See, e.g.*, *States v. McNair*, 605 F.3d 1152, 1189 (11th Cir. 2010) ("In concluding [that] § 666 does not require a specific *quid pro quo*, we align ourselves with the Sixth and Seventh Circuits." (citing

*United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009), *cert. denied*, 558 U.S. 1051 (Mem.) (2009); *Gee*, 432 F.3d at 714–15; *Agostino*, 132 F.3d at 1190)).

Thus, because this case is like *Agostino*, the same result follows here.[5] The indictment must allege only the intent elements "set forth in the statutory language," "and not any specific *quid pro quo*." *See Agostino*, 132 F.3d at 1190. And because the remaining § 666(a)(2) counts track the statute's intent elements, they are not "insufficient for failing to include" allegations of a *quid pro quo*. *See id.* Accordingly, while the Court might be inclined to reach a different result were it writing on a blank slate, the government need not allege a *quid pro quo* to charge an intent to influence (or reward) in Counts IV or V.[6]

### b.     Whether an Intent-to-Reward Theory Requires an "Official Act"

Defendants' final challenge to the indictment contends that, to pursue an intent-to-reward theory in the remaining § 666(a)(2) counts, the government must allege a narrowly defined "official act" in connection with their gifts. Defendants rest

---

[5]     In arguing that a *quid pro quo* is required in this case, Defendants insist that it "stands in stark contrast to every Seventh Circuit case addressing the requirements of § 666, all of which involved cash or concealed payments that directly benefitted the government official." Defs.' Reply Supp. Mot. at 19 n.5, ECF No. 53. But Defendants fail to explain why this difference matters in light of the statute's "anything of value" language, which places no limit on "the type of bribe offered." *See Salinas*, 522 U.S. at 57 (discussing § 666(a)(1)(B)).

[6]     Even if the government did have to allege a *quid pro quo* to charge an intent to influence, that would be no basis for dismissing the remaining counts. Rather, the Seventh Circuit's case law necessarily implies that § 666(a)(2) establishes one single offense with two means of violating it. *See Boender*, 649 F.3d at 654–55; *Gee*, 432 F.3d 714. After all, unlike § 201, § 666(a)(2) "criminalizes both bribes and rewards in the same section." *Boender*, 649 F.3d at 655; *cf. United States v. Cureton*, 739 F.3d 1032, 1041 (7th Cir. 2014) ("[I]t is Congress who establishes and defines offenses . . . ."). Thus, because the government has also alleged that Defendants intended to reward the Clerks, it would remain free to pursue this theory in the remaining § 666(a)(2) counts.

this argument exclusively on *Sun-Diamond*, which construed § 201's definition of an "official act." *See* 18 U.S.C. § 201(a)(3); *Sun-Diamond*, 526 U.S. at 404–05.

Courts—including, by implication, the Seventh Circuit—have unanimously rejected this argument, noting that *Sun-Diamond* focused on a differently worded statute. *See United States v. Garrido*, 713 F.3d 985, 1001 (9th Cir. 2013) (collecting cases, including *Gee*); *cf. Gee*, 432 F.3d at 714–15 (noting, in holding that § 666(a)(1)(B) does not require proof of a *quid pro quo*, that that the evidence need not establish "any specific act" by the official "in response to any specific payment").

Even assuming *arguendo* that the government must allege an "official act" within the meaning of § 201(a)(3) to charge an intent-to-reward violation under § 666(a)(2), the indictment does so. Section 201(a)(3) defines an "official act" to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity." 18 U.S.C. § 201(a)(3). "The pertinent 'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective." *McDonnell*, 136 S. Ct. at 2374. "Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit the definition of an official act." *Id.* at 2372 (cleaned up).

Here, the indictment identifies at least one "official act" for which Defendants intended to reward the Cook County Clerk: "awarding [debt collection] contracts" to Penn Credit. *See* Indictment Count I ¶ 4(a); *see also id.* Count IV ¶ 2, Count V ¶ 2.

The indictment further alleges that the Cook County Clerk had discretionary authority to award contracts and used that authority to contract with Penn Credit. *See id.* Count I ¶ 1(a), (h).  Such an award undoubtedly constitutes an "official act" within the meaning of § 201(a)(3).  *See* 2/17/19 Order at 7, *Tamras-Martin*, No. 18-CR-267-2, ECF No. 63 ("The awarding of government contracts to outside vendors may qualify as an official act." (citing *Peleti*, 576 F.3d at 382–83)); *see also, e.g.*, *Cordaro v. United States*, 933 F.3d 232, 242 (3d Cir. 2019) ("Entering into contracts is 'a formal exercise of governmental power' that falls 'within the specific duties of an official's position.'" (quoting *McDonnell*, 136 S. Ct. at 2369)).

Defendants' arguments to the contrary are unpersuasive.  They mainly contend that the indictment must link their rewards to specific contracts or referrals, but such specificity is not necessary in an indictment.  *See United States v. Suhl*, 885 F.3d 1106, 1115 (8th Cir. 2018) (even assuming that § 666 requires an "official act," the government need not "link" the payment "to any particular" official action), *cert. denied*, 139 S. Ct. 172 (Mem.) (2018).  What matters is that the act of awarding a government contract is a decision or action on a "specific and focused" question or matter within the duties of a county clerk.  *See McDonnell*, 136 S. Ct. at 2372; *Sun-Diamond*, 526 U.S. at 406–07; *cf. Smith*, 230 F.3d at 305 (stating that the indictment need only "provide some means of pinning down the specific conduct at issue").  Furthermore, the nexus between the payment and the official action is satisfied so long as the gifts were given "in connection with" the award of contracts.  *See Suhl*, 885 F.3d at 1115 (quoting 18 U.S.C. § 666(a)(2)).

23

Thus, assuming for now that the government must identify an "official act" to charge a violation of § 666(a)(2) based upon an intent-to-reward theory, the relevant counts in the indictment are sufficiently pleaded. In short, Counts IV and V are sufficient with respect to both intent prongs of § 666(a)(2); as is Count I to the extent it does not rest on campaign contributions.

## B.     Whether 18 U.S.C. § 666(a)(2) Is Constitutional

Defendants argue that § 666(a)(2) is unconstitutional because it is: (1) facially overbroad under the First Amendment; (2) void for vagueness under the Fifth Amendment; and (3) inconsistent with the federalism principles enshrined in the Tenth Amendment. Because these arguments all hinge on *McDonnell*, the Court begins with an overview of that case.

### 1.     The *McDonnell* Case

In 2014, federal prosecutors indicted former Virginia Governor Robert McDonnell on bribery charges related to his acceptance of $175,000 in loans, gifts, and other benefits while in office, in exchange for his help getting Virginia's public universities to perform research studies on a nutritional supplement ingredient. 136 S. Ct. at 2361. Although the charges were brought under 18 U.S.C. §§ 1343, 1349 (honest services fraud) and § 1951 (Hobbs Act extortion), the parties agreed to import § 201's definition of an "official act." *Id.* at 2365; *cf. Dimora v. United States*, 973 F.3d 496, 500 n.3 (6th Cir. 2020) (explaining that "courts commonly construe" federal bribery statutes other than § 201 "as requiring an 'official act'"). As a result, the

government had to prove "that Governor McDonnell committed or agreed to commit an 'official act' in exchange for the loans and gifts." 136 S. Ct. at 2365.[7]

The issue before the Court was whether the Governor's challenged conduct satisfied § 201(a)(3)'s definition of an "official act." *Id.* at 2367. That conduct consisted of arranging meetings, speaking with subordinate Virginia officials, and hosting and attending events. *Id.* at 2365–66. In holding that it did not, the Court relied first and foremost on the plain statutory text as well as relevant precedent. *See id.* at 2368–72. "Setting up a meeting, hosting an event, or calling an official . . . merely to talk about a research study or to gather additional information," the Court reasoned, "does not qualify as a decision or action on the pending question of whether to initiate the study." *Id.* at 2371.

Not stopping there, the Court went on to address three "significant constitutional concerns" that the government's "expansive interpretation of an official act'" would raise. *Id.* at 2372. "In the Government's view," the Court noted, "nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*" in the requisite *quid pro quo* under § 201. *Id.*; *see Sun-Diamond*, 526 U.S. at 404–05. "But conscientious public officials," the Court observed, "arrange meetings for constituents, contact other officials on their behalf,

---

[7] An "exchange" was required in *McDonnell* because the Supreme Court had previously construed both honest services fraud and Hobbs Act extortion to require as much. *See Skilling v. United States*, 561 U.S. 358, 413 (2010) (honest services fraud); *Evans v. United States*, 504 U.S. 255, 268 (1992) (Hobbs Act extortion). In line with other circuits, the Seventh Circuit has understood that to mean these offenses require a *quid pro quo*, although not an explicit one, even where campaign contributions are not at issue. *See United States v. Johnson*, 874 F.3d 990, 999 (7th Cir. 2017) (honest services fraud); *United States v. Giles*, 246 F.3d 966, 972 (7th Cir. 2001) (Hobbs Act extortion).

and include them in events all the time." *McDonnell*, 136 S. Ct. at 2372. Indeed, "[t]he basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns." *Id.* The Court thus feared that the "breathtaking expansion of public-corruption law" entailed by the government's interpretation would likely chill ordinary "political interaction between public officials and their constituents," *id.* (cleaned up), posing similar First Amendment concerns as those raised in *McCormick*.[8]

In explaining its holding, the Supreme Court outlined two hypotheticals that Defendants echo here. In the first example, the Court theorized that if a "union had given [a politician] a campaign contribution in the past," that politician "might wonder whether [he] could respond" to the union's concerns "about a plant closing." *Id*. And likewise, homeowners who previously invited an "official to join them on their annual outing to the ballgame," might "shrink from" asking the official "why it took five days to restore power to their neighborhood after a storm." *Id*. The Court worried that the government's limitless reading of § 201(a)(3) "could cast a pall of potential prosecution" over such "commonplace" interactions, causing public officials and citizens alike to "shrink from participating in democratic discourse." *Id*.

Turning from the First Amendment to the Fifth, the Court voiced a "related concern" that, "under the Government's interpretation, the term 'official act' is not defined with 'sufficient definiteness that ordinary people can understand what

---

[8] While *McDonnell*, like *McCormick*, did not explicitly cite the First Amendment, courts have understood this decision in First Amendment terms. *See, e.g.*, *Dimora*, 973 F.3d at 508 (Merritt, J., dissenting).

conduct is prohibited.'" *Id.* at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 402–03 (2010)). Reiterating that "the standardless sweep of the Government's reading" could subject public officials "to prosecution, without fair notice, for the most prosaic interactions," the Court sought to avoid that "vagueness shoal" by adopting a "more constrained interpretation of § 201(a)(3)." *Id.* (cleaned up).

Furthermore, the Court stressed that the government's interpretation raised "significant federalism concerns." *Id.* It noted that, as sovereigns, states exercise "the prerogative to regulate the permissible scope of interactions between state officials and their constituents," and a "more limited interpretation of 'official act'" avoided the need for the federal government to involve itself "in setting standards of good government for local and state officials." *Id.* (cleaned up). And so, the Court vacated McDonnell's convictions. *Id.* at 2373–75.

### 2. Defendants' Constitutional Arguments

Defendants raise a challenge to § 666(a)(2) based upon the three constitutional concerns highlighted in *McDonnell*. The Court addresses each in turn.

### a. Overbreadth

Rooted in the concern that "an overly broad law may deter constitutionally protected speech, the overbreadth doctrine allows a party to whom the law may constitutionally be applied to challenge the statute on the ground that it violates the First Amendment rights of others." *United States v. Stevens*, 559 U.S. 460, 483–84 (2010) (Alito, J., dissenting). To this end, the overbreadth doctrine provides that "a law may be invalidated as overbroad if a substantial number of its applications are

27

unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (majority opinion) (cleaned up). But a defendant who seeks to make this showing "assumes a heavy burden." *United States v. Johnson*, 875 F.3d 360, 365 (7th Cir. 2017) (cleaned up). And because the doctrine is "strong medicine" that departs from "traditional rules of standing," it may be employed "only as a last resort."[9] *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

As an initial matter, the Court questions Defendants' assumption that the overbreadth doctrine applies in this context. This doctrine typically applies to "speech and expressive conduct protected by the First Amendment." *E.g.*, *Johnson*, 875 F.3d at 365. Interactions with public officials, on the other hand, would seem to implicate one's "freedom of political association"—a distinct First Amendment right. *See Buckley*, 424 U.S. at 24–25 (addressing campaign contributions); *cf. United States v. Ng Lap Seng*, 934 F.3d 110, 138 (2d Cir. 2019) (characterizing the constitutional concern addressed in *McDonnell* as "representative government"), *cert. denied*, 141 S. Ct. 161 (Mem.) (2020). And Defendants cite no case showing that such a right triggers the overbreadth doctrine. Even *McDonnell*, the case on which Defendants hinge their First Amendment attack, does not mention it.

What is more, even if the First Amendment concerns highlighted in *McDonnell* were to trigger the overbreadth doctrine here, Defendants' arguments are unavailing. Defendants contend that, unless the Court imputes the requirement of an "official

---

[9]     Outside of the overbreadth context, a facial challenger must show that the statute "is unconstitutional in all of its applications," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); or that it "lacks any plainly legitimate sweep," *Stevens*, 559 U.S. at 472 (cleaned up).

act" within the meaning of § 201(a)(3)) to § 666(a)(2), the statutory text of § 666(a)(2) is hopelessly overbroad. But this is not the case. Rather than criminalizing the giving of a bribe for "nearly anything a public official does—from arranging a meeting to inviting a guest to an event" (the concern discussed in *McDonnell*, *see* 136 S. Ct. at 2372), the language of § 666(a)(2) is significantly more circumscribed, limiting its reach to bribes or rewards related to any "*business, transaction, or series of transactions*" of the public official's governmental unit "involving anything of value of $5,000 or more." *See* 18 U.S.C. § 666(a)(2) (emphasis added).

Read in context, "business" is best understood to refer to "activity involving the exchange of money for goods or services," including governmental services. *See Business*, Encarta Webster's Dictionary of the English Language 257 (2d ed. 2004); *cf. United States v. Robinson*, 663 F.3d 265, 275 (7th Cir. 2011) (holding that the statute covers "intangible" business, such as "law enforcement services"). Similarly, "transaction" is best read to mean "an instance of doing business" or "an act of . . . carrying out a business deal." *See Transaction*, Encarta Webster's Dictionary of the English Language 1970 (2d ed. 2004). Moreover, the business, transaction, or series of transactions forming "the subject matter of the bribe" must also be "valued at $5,000 or more." And, as a further limitation, the statute "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." 18 U.S.C. § 666(c). These terms sufficiently cabin the subject matter of a bribe or reward to economic transactional activity and, in so doing, avoid any overbreadth concerns suggested by *McDonnell*.

### b.   Vagueness

Defendants' vagueness challenge fares no better.   Arising from the Fifth Amendment's due process clause, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  Vagueness and overbreadth have been "traditionally viewed . . . as logically related and similar doctrines." *Id.* at 358 n.8.  Where a statute implicates First Amendment rights, its vagueness, like its overbreadth, is assessed "on its face" rather than "as applied."[10]   *Ng Lap Seng*, 934 F.3d at 135 (citing *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)).

Every circuit court to have addressed this issue has held that § 666 is not void for vagueness. *Id.* at 138 ("[C]ourts have uniformly rejected vagueness challenges to . . . § 666."); *see United States v. Hardin*, 874 F.3d 672, 677 (10th Cir. 2017); *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993).  While Defendants attempt to downplay these cases on the ground that some of them predate *McDonnell*, that argument falls flat.  Far from breaking new ground in this area, *McDonnell* applied long-standing concepts. *See* 136 S. Ct. at 2373 (citing *Lawson*, 461 U.S. at 368).  And numerous courts have rejected vagueness challenges to § 666 after *McDonnell*. *See, e.g.*, *Ng Lap Seng*, 934 F.3d at 135–38; *Hardin*, 874 F.3d at 677.

---

[10]    For this reason, Defendants' separate "as applied" vagueness challenge, *see* Mem. at 44–48, is  out of place.

Closer reading confirms that *McDonnell* does not suggest a vagueness problem in § 666(a)(2). As with the Supreme Court's First Amendment concern, its Fifth Amendment concern sprang from the government's view in that case that "nearly anything a public official does" qualifies as an "official act." *See* 136 S. Ct. at 2372. Such a "standardless sweep," the Court reiterated, would risk subjecting public officials to prosecution "for the most prosaic of interactions." *Id.* at 2373 (cleaned up). But here, for reasons the Court has explained, the language on which Defendants focus is not nearly as expansive, being limited to "business" and "transactions" involving $5,000 or more in value. *See* 18 U.S.C. § 666(a)(2); *see also Robinson*, 663 F.3d at 274–75 (noting in *dicta* that § 666(a)(2) is "[n]o more ambiguous than the circumscribed version of the honest-services fraud offense after *Skilling*"). What is more, the statute's intent elements further alleviate any vagueness concerns. *See McFadden v. United States*, 135 S. Ct. 2298, 2307 (2015) ("[A] scienter requirement in a statute alleviate[s] vagueness concerns." (cleaned up)).

The primary case Defendants cite in their reply brief is inapposite. *See RCP Publ'ns Inc. v. City of Chi.*, 304 F. Supp. 3d 729 (N.D. Ill. 2018). That case concerned a city ordinance prohibiting the distribution of "commercial advertising material," a term it did not define. *Id.* at 732. In finding the ordinance unconstitutionally vague, the court reasoned that this key phrase lacked a common-sense definition and that the City's own history of interpreting and enforcing the ordinance was rife with "fundamental inconsistencies." *See id.* at 743–45. None of this reasoning applies to the statutory language at issue here.

31

### c.     Federalism

That leaves Defendants' contention that § 666(a)(2) interferes too much with principle of federalism rooted in the Tenth Amendment.  But Second Circuit recently rebuffed an identical argument.  *See Ng Lap Seng*, 934 F.3d at 138 ("No federalism concerns render § 666(a)(2) constitutionally infirm.").  As that court emphasized, "Congress was within its prerogative to protect [federal] spending . . . from the menace of local administrators on the take."  *Id*. (quoting *Sabri v. United States*, 541 U.S. 600, 608 (2004)).  Defendants fail to address the Second Circuit's analysis, and their reply brief abandons this argument altogether.

In sum, none of Defendants' constitutional challenges persuade the Court to strike down § 666(a)(2) under *McDonnell*.

## C.     Whether the § 666(a)(2) Counts Are Duplicitous

Unable to undermine the statute's constitutionality, Defendants next urge the Court to dismiss the remaining § 666(a)(2) counts as duplicitous.[11]  Generally, "[a]n indictment that charges two or more distinct offenses within a single count is duplicitous." *United States v. Hassebrock*, 663 F.3d 906, 916 (7th Cir. 2011).  On the other hand, "[a] count is not duplicitous . . . if it simply charges the commission of a single offense by multiple means." *United States. v. Burge*, No. 08-CR-846, 2009 WL 3597950, at *5 (N.D. Ill. Oct. 27, 2009) (citing *United States v. Berardi*, 675 F.2d 894, 897–98 (7th Cir. 1982)).

---

[11]     Having already dismissed Counts II, III, and VI for failure to allege an explicit *quid pro quo*, the Court need not address them again in analyzing Defendants' argument that the § 666(a)(2) counts are each duplicitous.

Defendants acknowledge that the § 666(a)(2) counts are duplicitous only if the statute "contains two separate and distinct offenses." Mem. at 53. But as explained above, controlling precedent necessarily implies that this provision sets forth just one offense, with two means (in the form of two intents) of violating it. *See Boender*, 649 F.3d at 654–55; *Gee*, 432 F.3d 714. It follows that these counts are not duplicitous for alleging an intent both to influence and to reward.

The other argument that Defendants raise here hinges on the Sentencing Guidelines. Because the Guidelines prescribe steeper penalties for individuals who intend to influence government officials rather than reward them, Defendants posit that § 666(a)(2) must outline different offenses. *Compare* U.S.S.G. § 2C1.1, *with id*. § 2C1.2. But the Sentencing Commission often recommends different punishments for defendants who commit the same offense in different ways. For example, § 2C1.1(b)(2) states that defendants who pay more than $ 6,500 in bribes merit lengthier sentences than those who pay less. No one would argue that those circumstances involve distinct offenses that must be charged in separate counts. As a result, the Guidelines do not indicate that Counts IV and V are duplicitous.

## D.     Whether Count I Alleges Multiple Conspiracies

Defendants' final ground for dismissal also lacks merit. In Count I, the indictment alleges that Penn Credit, Donagher, and numerous lobbyists conspired to influence and reward the Clerks of three counties in Florida and one in Illinois. As Defendants would have it, Count I improperly combines two conspiracies—in Illinois and Florida, respectively—in one count.

To demonstrate a conspiracy, "the government must prove that [the defendant] knowingly and intentionally joined in an agreement with one or more other individuals to commit an unlawful act." *United States v. Avila*, 557 F.3d 809, 815 (7th Cir. 2009). As relevant here, a "hub and spoke" conspiracy refers to "an arrangement in which a core conspirator . . . moves from spoke to spoke, directing the functions of the conspiracy." *United States v. Bustamante*, 493 F.3d 879, 885–86 (7th Cir. 2007) (cleaned up). "[F]or such a conspiracy to exist, those people who form the wheel's spoke must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *Id.* (cleaned up).

At issue here is whether the Illinois and Florida lobbyists furthered the same objective. Because the lobbyists focused their efforts on Clerks in different states, Defendants posit that they pursued different purposes. For its part, the government counters that the conspiracy should be understood at a higher level of generality. Given that the conspirators allegedly bribed the clerks to refer debt collection work to Penn Credit, the government says, they shared a "common criminal objective." *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

The government has the better of this argument. Most of the time, the Seventh Circuit rejects defendants' efforts to define conspiracies narrowly. In *Avila*, for example, the defendant claimed that "a conspiracy must be more specific than simply to further distribute drugs"; instead, he contended that a conspiracy must center on a specific location, such as a "particular block of West 50th Place." 557 F.3d at 816.

34

Unwilling to cabin the geographic scope of the alleged conspiracy, the Seventh Circuit held that "[s]uch a specific purpose is not required." *Id.*

Similar logic establishes that the indictment adequately alleges that the Illinois and Florida lobbyists advanced a single conspiracy. For one thing, the lobbyists pursued the same end: enriching Penn Credit through debt-collection referrals. For another, the alleged conspirators embraced similar tactics, such as making donations early in an election campaign. *See* Indictment Count I ¶ 1(k), (m), (ff). And finally, the lobbyists acted at the direction of a leader, Donagher, who coordinated their efforts. Viewed in the light most favorable to the government, these allegations are sufficient to describe a single conspiracy.

It is no answer to say, as Defendants do, that some of the lobbyists may not have known each other. While conspirators must retain some general "aware[ness]" that the scheme involves other participants, *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977)), they need not "know one another," *Jones*, 275 F.3d at 652; *cf. Bustamante*, 493 F.3d at 885 ("[A] rim must connect the spokes together, for otherwise the conspiracy is not one but many."). Besides, Donagher's role as a coordinator supports a reasonable inference that the lobbyists did know of each other, even if they never met in person, and this is enough for now.

\* \* \*

To sum up, while Defendants level numerous attacks on the indictment, they achieve limited success. When the government brings § 666(a)(2) charges centered on campaign contributions, it must plead an explicit *quid pro quo*. That means that

35

the campaign-contribution charges (Counts II, III, and VI) must be dismissed. The same is true of the conspiracy charge (Count I) to the extent that it rests on campaign contributions. But since Defendants' other arguments are unavailing, the remaining § 666(a)(2) charges (Counts IV and V), as well as the conspiracy charge to the extent it does not rest on campaign contributions, withstand dismissal. With that, the Court turns to Defendants' remaining pretrial motions.

### III.  <u>Motion to Strike Surplusage</u>

Defendants move to strike paragraph 12(t) as prejudicial surplusage under Federal Rule of Criminal Procedure 7(d), which provides "a means of protecting the defendant against immaterial or irrelevant allegations in an indictment . . . which may, however, be prejudicial." *United States v. Andrews*, 749 F. Supp. 1517, 1518 (N.D. Ill. 1990) (quoting Fed. R. Crim. P. 7 advisory committee's note to subdivision (d)). But the Court may do so "only if the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *See id.* at 1518–19 (cleaned up). "[T]his is a rather exacting standard, and only rarely has surplusage been ordered stricken." *Id.* at 1519 (cleaned up).

The paragraph with which Defendants take issue states as follows:

> On or about June 10, 2014, DONAGHER used a PENN CREDIT card and paid approximately $936 to a strip club in West Palm Beach, Florida, which payment covered expenses incurred by DONAGHER, Clerk Eddie Fernandez, and other attendees of the Florida Court Clerk & Comptrollers Conference at the strip club.

Indictment Count I ¶ 12(t). Defendants decry the reference to a strip club as "completely irrelevant," "salacious," "obviously prejudicial," and "unfair." Mem. at

62–63. But they fail to show that the reference to a strip club is "clearly not relevant." *See Andrews*, 749 F. Supp. at 1518. Nor can they, for the allegation that Defendants spent nearly a thousand dollars there for the benefit of Florida officials—a payment which constitutes a "thing of value" under § 666(a)(2)—is plainly relevant to the conspiracy charged in Count I. As a result, the Court declines to strike paragraph 12(t) as surplusage.

### IV.     <u>Motion for a Bill of Particulars</u>

Defendants also request that the government submit a bill of particulars. *See* Fed. R. Crim. P. 7(f). The test for deciding whether to grant a motion for a bill of particulars is "similar to the test for determining the general sufficiency of the indictment." *United States v. Fassnacht,* 332 F.3d 440, 446 (7th Cir. 2003). As such, "[a]n indictment which includes each of the elements of the offense charged, the time and place of the accused's conduct which constituted a violation, and a citation to the statute or statutes violated is sufficient to pass this test." *Id.*

Here, Defendants demand that the government disclose three types of information. First, they insist that it reveal whether it intends to proceed under an influence or a reward theory for each surviving count in the indictment. "To require the Government to articulate and be bound to a particular theory at this early stage in the proceedings," however, "is neither constitutionally nor statutorily required." *Agostino*, 132 F.3d at 1191; *cf. United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981) ("The defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved."). After all, "[n]o one knows

why" Defendants made their payments on behalf of the Clerks "better than" Defendants do. *See Agostino*, 132 F.3d at 1191.

The same explanation defeats Defendants' second request, that the government identify the "business, transactions, or series of transactions" involved in each count. *See* 18 U.S.C. § 666(a)(2). Indeed, this was the precise request that *Agostino* rebuffed: the defendant "wanted to know what business or transaction" the government alleged "he was trying to influence." 132 F.3d at 1191. Once again, "[n]o one knows why" Defendants made the challenged payments better than they do. *See id.* Besides, the indictment already pins down the business or transactions at issue to debt collection contracts with four counties and "the referral of traffic debt placements" pursuant to those contracts, *see* Indictment Count I ¶ 1(a), Count IV ¶ 2, Count V ¶ 2, which provides "sufficient details regarding the . . . conduct for which" Defendants are being charged, *see Fassnacht*, 332 F.3d at 447.

Finally, Defendants claim that they are entitled to the names of every alleged co-conspirator. But the government affirms that it has "identified to defense counsel all persons anonymized in the indictment" and produced "all statements of any known or suspected conspirators." Resp. at 44–45. And, although Defendants read stray language in the response brief to suggest that the government is withholding co-conspirators' identities, based upon the record before it, the Court does not share their skepticism. Accordingly, the motion for a bill of particulars is denied.

## V. <u>Motion to Compel Early *Santiago* Proffer and Rule 404(b) Notice</u>

Finally, Defendants request that the government submit its *Santiago* proffer ninety days before trial and its Federal Rule of Evidence 404(b) notice sixty days

before trial, which is sooner than the rules would require. As they see it, the complexity of this case makes early disclosure essential. After Defendants filed this motion, however, the trial date and briefing schedule were stricken in light of the COVID-19 outbreak. Therefore, the request for early notification is denied as moot. When it comes time to set new deadlines, Defendants may renew this request.

## VI.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Counts II, III, and VI are dismissed without prejudice, as is Count I to the extent it is premised on payments of campaign contributions, while Counts IV, V, and the rest of Count I may go forward. In addition, Defendants' motions to strike surplusage and for a bill of particulars are denied, while their motion to compel an early *Santiago* proffer and Rule 404(b) notice is denied as moot.

IT IS SO ORDERED                    ENTERED  2/19/21

_____
**John Z. Lee**
**United States District Judge**

39